UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYSTEMATIC RECYCLING, LLC,

                  Plaintiff,                        Case Number 09-11430

v.                                                    Honorable David M. Lawson

CITY OF DETROIT and WILLA J.
WILLIAMS,

                  Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
CLARIFICATION OF AND RELIEF FROM TEMPORARY RESTRAINING
ORDER AND DENYING PLAINTIFF'S AMENDED
MOTION FOR PRELIMINARY INJUNCTION**

The plaintiff is a company that operates a composting facility in the Delray neighborhood

of Detroit under a conditional zoning permit issued by the City of Detroit's Buildings and Safety

Engineering Department. One of the conditions to the grant of the zoning permit was the execution

of a "Community Host Agreement" between the plaintiff and the city, which required city council

approval. After the Detroit City Council approved the Community Host Agreement and the

conditional zoning permit was issued, disturbing facts came to light suggesting that the approval

may have been procured by bribes, which cast a shadow over the validity of the agreement. In

addition, the city received complaints about the operation of the facility, and the fire department

reported possible spontaneous combustion of some of the compost. Rather than attempt to rescind

the Host Community Agreement, however, the city simply let it expire at the end of its stated two-

year duration, and then moved to revoke the conditional land use grant based on the failure of that

condition. The plaintiff filed an action in the Wayne County, Michigan circuit court under 42 U.S.C.

§ 1983 alleging a violation of its due process and equal protection rights and obtained a temporary

restraining order (TRO) enjoining the city and its Interim Director of the Department of Environmental Affairs, defendant Willa J. Williams, from taking action to revoke the permit. The defendants timely removed the action to this Court and filed a motion seeking clarification of or relief from the state court's TRO. The plaintiff filed an amended motion for preliminary injunction. The Court held hearings on the motions, permitted limited discovery, and received several supplemental filings from all parties. While the matters have been under advisement, the city has honored the state court's TRO. The Court now finds that the plaintiff has not established a violation of its rights under the Equal Protection Clause, and even if the plaintiff has a property interest in the continuation of the conditional zoning permit, which is questionable, the city's proposed pre-deprivation hearing procedure coupled with the opportunity for post-hearing judicial review provides ample procedural protection to satisfy the Due Process Clause. Because the plaintiff has not demonstrated a likelihood of success on the merits, and other factors do not favor the plaintiff, the Court will grant the defendant's motion for clarification, deny the plaintiff's amended motion for a preliminary injunction, and dissolve the state court's TRO.

I.

Systematic Recycling, LLC operates a composting facility located at 9125 Jefferson in the Delray neighborhood of the City of Detroit, which, according to the defendants, is an area of intense industrial activity zoned as "M4" on the Detroit Zoning Ordinance Map. Renee Michaels is the sole owner of Systematic Recycling. Michaels and her family members previously had operated a composting facility in Macomb County known as King of the Wind Farms, Inc.; according to the defendants, that facility was closed because it generated about four hundred complaints of nuisance. Michaels then leased the facility at 9125 Jefferson from James R. Rosendall, a former Synagro

-2-

Technologies vice president. Before the plaintiff began its current operations, the facility housed a paper company plant.

As noted above, the land the plaintiff proposed to use for the composting facility was zoned "M4" under Article X, Division 5 of the Detroit City Zoning Ordinance. A composting facility is not listed as a permitted use in that district, and the city's ordinances in effect at the time did not mention "composting facilities," although it professed to regulate such uses as "recycling centers." Wayne County regulated composting facilities under its solid waste ordinance, which required an operator to enter into a host community agreement under its solid waste management plan. For the City of Detroit, it appears that the plaintiff's application to operate a composting facility was the first of its kind.

On April 26, 2006, the City of Detroit's Buildings and Safety Engineering Department conditionally approved the plaintiff's application to establish and operate the composting facility. One of the conditions for the approval was that "Systematic Recycling shall enter into a Host Community agreement with the City of Detroit's Department of Environmental Affairs prior to operating the site as a Compost facility." Defs.' Mot. for Clarification or Relief from Apr. 30, 2009 Order [dkt. # 5-3], Ex. A (Conditional Zoning Permit), at ¶ 26. However, the city council was slow to approve the Host Community Agreement, and Systematic was allowed to begin operation and start receiving waste in the summer of 2006 under a temporary permit issued by the City. It was not until March 30, 2007, almost a year later, that the plaintiff finally entered into the Host Community Agreement with the city. The Host Community Agreement was to "continue in effect for a period of Two (2) years" beginning on the date it was signed. Defs.' Mot. for Clarification or Relief from Apr. 30, 2009 Order [dkt. # 5-4], Ex. B at § 17.

The defendants explain that the host community agreement requirement was important to them in order to enhance the city's regulatory authority over composting facilities. Vincent R. Nathan, Ph.D., the director of the city's Department of Environmental Affairs, testified that there was "a void in the law between state and Wayne County." Pl.'s Notice of Filing Documents in Supp. of Mot. for Prelim. Inj., Ex 5 [dkt. # 21-8] (Nathan dep.) at 49. He said the state and local governments "had no composting regulation, so we developed the host community agreement. City council had to approve it." *Ibid.*

It was not until March of 2008 that the State of Michigan enacted legislation to regulate composting facilities located in the state. Before that time, unless a property owner's practices violated the air or water pollution provisions of certain federal statutes, the state Department of Environmental Quality could not take any enforcement actions against owners of composting facilities. *See* Analysis of Senate Bill 513 as enacted, Jan. 30, 2007, 94th Leg., Reg. Sess. (Mich. 2007). The statute regulating composting facilities was enacted in January 2008, *see* Mich. Comp. Laws § 324.11521 (eff. Mar. 26, 2008), based on the concern that "existing law does not give State agencies sufficient authority to take actions against rogue composters in a timely fashion." *See* First Analysis of Senate Bill 513, July 5, 2007, 94th Leg., Reg. Sess. (Mich. 2007). The only facility affected by the new statute in the City of Detroit happened to be Systematic.

Before the 2008 statute, the city's regulatory authority over composting facilities rested upon Wayne County's solid waste ordinance, *see* Enrolled Wayne Co. Ord. 2004-787, § 235, and the Wayne County Solid Waste Management Plan, which city representatives did not regard as especially effective. Detroit does not have an ordinance directly regulating composting facilities in the city either. However, the city's zoning ordinance regulates recycling centers, which include

-4-

"land, with or without buildings, upon which wastes are recovered in a process designed to provide an acceptable reuse of all or part of the waste." City of Detroit Zoning Ordinance § 61-16-162. The plaintiff's business fits that definition, and as such it is designated as a "conditional manufacturing and industrial use[]" under the ordinance, *see id.* § 61-10-83(12), in the M4 District, *id.* § 61-10-79. The city concluded therefore that its Buildings and Safety Engineering Department could "impose reasonable conditions or limitations upon the establishment, location, construction, maintenance, or operation of the Conditional Use as may be necessary, in its judgment, for the protection of the public interest, health, safety, welfare and environment. . . ." *Id.* § 61-3-241(b). The host community agreement requirement was one of those conditions.

The host community agreement included a number of requirements and restrictions for operating the facility, closure and remediation provisions, and performance bond obligations, and it stated that a violation of any of these conditions could result in the revocation of the grant. The agreement required the plaintiff to pay a one-time fee of $10,000 to the city and a solid waste host fee of $10,000 to be paid semiannually, and submit to regular inspections by the city officials. The termination provisions state:

> This Agreement shall take effect on the date executed by the parties, and shall continue in effect for a period of Two (2) years. The parties agree to review the host community payment provisions of this Agreement from time-to-time [sic], but in no event later than the annual anniversary of this Agreement. This fee will increase or decrease by the same percentage as the Consumer Price Index, All Urban, which shall be measured over the most recently reported 12-month period. The initial adjustment shall take place on the first anniversary of this Agreement with each subsequent adjustment to take place on an annual basis thereafter.

> This agreement may be terminated by the City for any reason if the Applicant has received two (2) or more significant violations from the City within a 180 day time period. The determination of what constitutes a significant violation shall be within the sole discretion of the Director of Department of Environmental Affairs. Said termination shall be effective 30 days after written notice of said termination

is placed in a United States Post Office mail receptacle and addressed as specified in Paragraph 21(E). Upon termination of this Agreement, Applicant shall have no right to continue to operate the Facility.

Defs.' Mot. for Clarification or Relief from Apr. 30, 2009 Order [dkt. # 5-4], Ex. B (Host Community Agr.) at § 17. According to the City, the two-year term, which is uncharacteristic for host community agreements in general, was imposed out of concern that the facility might become a nuisance. The plaintiff denies that any such concerns ever existed and argues that the two-year limit was imposed for the purpose of reviewing and adjusting the host community payment provisions of the agreement.

The plaintiff commenced operations in the spring of 2006. Under the terms of the Host Community Agreement, the plaintiff agreed to comply with all applicable state, local, and federal laws, regulations and requirements regarding the construction and operation of the composting facility, including but not limited to all environmental requirements. *Id.* at § 13. However, the operations of Systematic Recycling became a subject of several residents' complaints. One resident complained of offensive odors. Defs.' Mot. [dkt # 5], Ex. H (Anthony Laginess aff.) at ¶ 6. An owner of a small store near the facility, stated that she had heard comments from many of her customers "that the smell outside the store is horrible." Defs.' Mot. [dkt # 5], Ex. I (Norma West aff.) at ¶ 5. She believed that "customers have left the parking lot of my business to go eat someplace else because the smell is so bad." *Ibid.* In its defense, the plaintiff mentions that the Wayne County circuit court case in which the two affidavits were filed were ultimately resolved in favor of Systematic Recycling on September 5, 2007. Systematic further emphasizes that the accounts of these two affiants were discredited during their cross-examination in the second

negligent and intentional nuisance case against Systematic. *Id.* at 10. That latter action remains to be pending in the Wayne County, Michigan circuit court. *Ibid.*

Within the period from December 2006 through November 2008, Systematic Recycling received several citations and warnings from the Michigan Department of Environmental Quality ("MDEQ") and Wayne County Department of Environment ("WCDE"), including citations and warnings for violations of the rule against emission of odors beyond the facility's property line, accumulating an excessive amount of yard clippings in violation of Mich. Comp. Laws § 324.11501 and fires that occurred from heat generated by compost piles maintained in violation of the Wayne County solid waste ordinances. The MDEQ sent Michaels a warning letter on October 7, 2008 citing problems including improper storage of yard clippings in excess of allowable limits, ponding water, pests between waste piles, and fires requiring Detroit Fire Department responses.

The City of Detroit itself never issued any citations to the plaintiff; however, an inspector for the City of Detroit Department of Environmental Affairs also detected strong composting odors emanating from the facility. The city now insists that the facility was in violation of state law even at the time of a final inspection on April 1, 2009.

The plaintiff, on the other hand, denies ever being issued a citation by the city for violation of any ordinance, statute, or condition of the plaintiff's conditional land use permit, and contends that it never received two "significant violations" within any given 180-day time period. The plaintiff also insists that it has never been fined by authorities. The plaintiff says that the citations they did receive were minor and when Systematic requested a review of the citations issued by the Wayne County Department of Environment in 2007 and 2008, the department dismissed or abandoned the prosecution of these citations.

In January of 2009, evidence came to light that Systematic Recycling might have secured its Host Community Agreement with the city by means of a bribe carried out by James R. Rosendall, an owner of the company that leased to Systematic its land in southwest Detroit. According to Rosendall's statements in a guilty plea agreement filed in this court, Systematic Recycling was one of the two companies that bribed the city officials to gain certain business benefits. Rosendall stated that his business owned the East Jefferson property, he leased it to Systematic to operate a composting facility, Systematic began operating under a temporary permit, and the City of Detroit closed the facility because it had not obtained a host community agreement from the city. Rosendall then stated:

> Defendant [Rosendall] discussed giving *Aide to City Official A* a financial interest in defendant's business in exchange for *Aide to City Official A's* assistance in obtaining the Community Host Agreement. Defendant also gave *Aide to City Official A* $2,000 in cash to give to *City Official B* as an inducement to facilitate the City administration's support of the Community Host Agreement. Defendant drove *Aide to City Official A* to *City Official B's* home, at which time *Aide to City Official A* dropped off money for *City Official B*. In September and October 2007, *Relative A* also inquired about receiving regular payments from Systematic Recycling, although *Relative A* did not facilitate the Community Host Agreement.

> During the period October to December, 2006, defendant caused Systematic Recycling to pay *Intermediary A* over $20,000, in part, to help defendant obtain later approval of the Community Host Agreement with the Detroit City Council, which was receiving opposition to the facility from local community groups and activists.

Def.'s Mot. [dkt # 5], Ex. J (Rule 11 Plea Agreement in *United States v. Rosendall*) at 8-9. Rosendall then stated that *Intermediary A* did not pay the bribe to *Council Member A*, as intended, so at a council session at which the host community was considered, "*Council Member A* said words to the effect of 'you don't have my vote and you're short.'" *Ibid.* However, after the financial arrangements were completed, "[o]n March 28, 2007, *Council Member A* voted in favor of the

Community Host Agreement, allowing Systematic Recycling to restart composting operations."

*Ibid.*

As these allegations of bribery surfaced and as Synagro (the other company that benefitted from Rosendall's bribery scheme) voluntarily terminated its contract with the city, the city decided not to revoke the host community agreement, but rather to simply let it expire at the end of March 2009. Interim Director of the City of Detroit Department of Environmental Affairs Willa J. Williams notified the plaintiff in a letter on March 2, 2009 as follows:

> The Host Community Agreement (Agreement) entered into on March 30, 2007 between the City of Detroit (City) and Systematic Recycling, L.L.C. (SR), for a Compost Recycling Operation at 9125 W. Jefferson, Detroit, MI, expires March 31, 2009. This letter is to notify SR that the City shall allow the agreement to expire.

> In accordance with Section 12, Clean-Up and Guarantee, and Section 13, Post-Closure Care, of the Agreement, SR shall commence closure activities no later than April 1, 2009.

Defs.' Mot. [dkt. # 5], Ex. M (Letter from Willa J. Williams to Renee Michaels).

In response to that letter, the plaintiff filed its action in state court on April 2, 2009 based on 42 U.S.C. § 1983. The plaintiff alleges that the defendants violated the plaintiff's due process rights because they did not provide it with a notice or hearing on any charges that would form the basis for revocation of a conditional land use permit. The plaintiff also alleges that the defendants violated its rights under the Equal Protection Clause by discriminating against it as a class of one, and against its female owner, Renee Michaels, on the basis of gender. The state court judge issued a TRO and set the case for a hearing on a preliminary injunction. Before the hearing date, the defendants removed the case to this Court on April 16, 2009.

After removal, the defendant scheduled hearings before the Building and Safety Engineering Department to revoke the conditional land use permit. However, the city eventually agreed to honor

the state court's TRO, and no hearings have taken place. the defendants then filed a motion seeking clarification of relief under the state court's TRO, asking that they be permitted to conduct the revocation hearings. The plaintiff filed an amended motion for preliminary injunction, seeking to forestall such action.

## II.

Federal Rule of Civil Procedure 65 allows the Court to issue a preliminary injunctions restraining conduct during the pendency of a lawsuit and before final judgment. The Court must consider four factors when determining whether to issue a preliminary injunction: (1) the likelihood of the party's success on the merits of the claim; (2) whether the injunction will save the party from irreparable injury; (3) the probability that granting the injunction will substantially harm others; and (4) whether the public interest will be served by the injunction. *Summit County Democratic Cent. and Executive Comm. v. Blackwell,* 388 F.3d 547, 550 (6th Cir. 2004); *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir. 1998); *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 399 (6th Cir. 1997); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985). The Sixth Circuit has explained that the purpose of a preliminary injunction "is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 226 (6th Cir. 1996).

"[T]he four factors are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). The district court need not make specific findings regarding each of the four factors if fewer factors are dispositive of the issue. *See Six Clinics Holding Corp.,* 119 F.3d at 399. "Although no one factor is controlling, a finding that there is

simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000). The plaintiff has the burden of proof, and that burden is the same irrespective of whether the relief sought is mandatory or prohibitive. *United Food & Commercial Workers Union, Local 1099 v. SW. Ohio Reg. Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998).

## A.

Of all the factors for determining the propriety of a preliminary injunction, the most important is the plaintiff's likelihood of success on the merits. The plaintiff's complaint is based on 42 U.S.C. § 1983. Under section 1983, the plaintiff must establish that a person acting under color of state law deprived it of a right secured by the Constitution or laws of the United States. *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). Section 1983 is not itself a source of substantive rights; rather, it provides a vehicle for vindicating rights provided by the Constitution. *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990).

As mentioned, the plaintiff alleges due process and equal protection violations. The Court will examine each in turn.

## 1.

In order to establish a procedural due process violation, the plaintiff must show that (1) it has a life, liberty, or property interest protected by the Constitution; (2) it was deprived of that interest by a state actor; and (3) it was not afforded timely and adequate process under law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). The plaintiff argues that it has a property and a liberty interest in continuing to operate the composting facility under the conditional land use permit

because it had done nothing to justify terminating the host community agreement, and city officials had represented that Systematic could operate even without that agreement.

"Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (quoting *Bd. of Regents of Stater Colls. v. Roth*, 408 U.S. 564, 577 (1972) (internal quotation marks omitted)).

The plaintiff's first argument – that the host community agreement cannot be revoked because the plaintiff did not commit the requisite violation – is undermined by the plain language of the agreement itself. The plaintiff insists that the agreement cannot be terminated unless it "has received two (2) or more significant violations from the City within a 180 day time period." Defs.' Mot. for Clarification or Relief from Apr. 30, 2009 Order, Ex. B [dkt. # 5-4] (Host Community Agr.) at § 17. It is uncontested that the City has not issued violations against the plaintiff. However, that argument ignores the first paragraph in section 17, which states that the agreement expires on its own after two years. The plaintiff insists that there was no understanding that the agreement would not be renewed after two years, and the anniversary date was inserted in order to reassess the payment terms. No evidence supports that assertion, and the language of the agreement contradicts it. Nor can it be said that termination was contingent on establishing a violation after the agreement's two-year term expired. Fairly read, section 17 states that the agreement will last for two years, but the City could terminate it *earlier* if the plaintiff received two or more significant citations within six months. The two-year duration could not have been merely a mechanism for escalating the fees Systematic must pay, since the city could increase those fees anyway after just one year.

Although it is clear that the plaintiff hoped that the host community agreement would be renewed, it is equally apparent that there was no legal entitlement to its continuation beyond two years. A "person clearly must have more than an abstract need or desire for [a certain benefit]. He must have more than a unilateral expectation of it. He must have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. The Court must conclude, therefore, that the plaintiff has no property interest in the host community agreement.

The plaintiff contends that it has a right to the conditional land use permit even without the host community agreement. This argument is based on statements by city officials made before the host community agreement was signed. Renee Michaels, Systematic's owner, states in her affidavit that she was "was told by Greg Moots, head of the City's Planning Commission, and Dr. Vincent Nathan, director of the city's Department of Environmental Affairs, that if the Host Community Agreement could not be put in place or was disapproved, then Systematic would still be able to operate, and either the City's Planning Commission or the City's Buildings and Safety Engineering Department would just waive that condition of the conditional/special land use grant." Notice of Filing of Suppl. Documents in Supp. of the Pl.'s Mot., Ex. 1 [dkt. # 19-2] (Michaels aff.), at ¶ 35. The plaintiff argues that at no time did a city official ever tell it that if the Host Community Agreement expired and was not terminated for cause, Systematic would have to shut down operations. According to Systematic, Dr. Nathan and Mr. Moots relayed the same information to the City Council.

The plaintiff also submitted a transcript of the November 17, 2006 city council meeting in which the agreement was discussed by certain council members as follows:

[Councilperson] S. COCKREL: Secondly, I want to get clear on this. If there is not a Host Agreement, there is ultimately a way for the project to go forward with less regulation than the Host Agreement that we have before us. Is that accurate?

NATHAN: It would proceed with no regulation.

S. COCKREL: Correct. So, this, in fact, may be a situation where there … all of us are concerned about the concerns of this community, but at the end of the day, not to approve this Host Agreement will result in less oversight, less requirements being on this use, and it's going to go ahead.

NATHAN: That's correct. [Ex. 2 at 4.]

. . .

[Councilperson] KENYATTA: It would have to come back to us, then, for that amendment, if Buildings & Safety have to be regulating.

MOOTS: It has to go to Buildings & Safety. Not to City Council. Just to Buildings & Safety.

S. COCKREL: Shall we guess what will happen there? Then the company won't have the level of regulation that they're voluntarily agreeing to in the Host Agreement. … people could end up with an unattractive use with less regulation than if we approved it. [Ex. 2 at 5.]

. . .

[Councilperson] K. COCKREL, JR.: … If I remember correctly, from the reading that I've done on this. Hasn't the Buildings & Safety Engineering Department already given some level of approval to this?

MOOTS: That's what I'm saying. The original permit which was issued, I believe in early summer, is the one that requires the Host Community Agreement. . . . Subsequent, . . . they withdrew the original Host Community Agreement and a temporary operating permit was issued to them, which had not conditions on it at all.

. . .

K. COCKREL, JR.: It's just a question of what they'll do, but I think I have an idea.

S. COCKREL: We have the precedent that it was already granted on a temporary basis.

Pl.'s Second Supp. Br. [dkt. # 29] at 2-3.

This evidence does not establish that host community agreement was thought to be an unnecessary artifact. To the contrary, the permit explicitly states that "Systematic Recycling shall enter into a Host Community Agreement with the City of Detroit prior to operating the site as a Compost Facility." Defs.' Emergency Mot. [dkt # 5], Ex. A (Cond. Zoning Permit) at ¶ 26. The accommodation allowed by the City through its temporary permit does not alter that condition.

-14-

Moreover, the plaintiff actually entered into the host community agreement with the city. Michigan law regards such agreements as contracts, which may not be altered by parol evidence if they are unambiguous. *Am. Prudential. Estates, Inc. v. Van Buren Twp.*, No. 213282, 2001 WL 672178, at \*2 (Mich. App. May 15, 2001) (citing *UAW-GM Human Res. Ctr. v. KSL Rec. Corp.*, 228 Mich. App. 486, 491-92; 579 N.W.2d 411, 414 (1998)). Furthermore, reliance on the statements of individual city council members is unreasonable as a matter of state law. "It is fundamental that those dealing with public officials must take notice of the powers of the officials. . . . Persons dealing with a municipal corporation through one of its officers must at their peril take notice of the authority of the particular officer to bind the corporation." *Johnson v. City of Menominee*, 173 Mich. App. 690, 693-94, 434 N.W.2d 211, 213 (1988). "Generally, no officer or board, other than the common council, has the power to bind the municipal corporation by contract." *Ibid.* Individual "municipal officers can bind a municipality only if they are empowered to do so by the city charter." *Manning v. Hazel Park*, 202 Mich. App. 658, 691, 509 N.W.2d 874, 877 (1993). There is no evidence that the Detroit City Charter authorized Dr. Nathan or Mr. Moots to bind the city in the absence of the majority vote by the Detroit City Council. *See* Detroit City Charter § 4-108 ("Except as otherwise provided by this Charter, no action of the City council shall be effective unless adopted by at least a majority of City council members present.").

However, the absence of a valid host community agreement does not mean that the plaintiff has no property interest in the conditional use permit, which has been issued. In *Dorr v. City of Ecorse*, 305 F. App'x 270 (6th Cir. 2008), the Sixth Circuit held that a property owner had established a property interest in two separate building permits issued to him by the city, even though the city asserted that the plaintiff's nonconforming use exceeded the scope that the city

allowed.  Similarly, in *Chandler v. Village of Chagrin Falls*, 296 F. App'x 463 (6th Cir. 2008), the court held that the homeowner who sued the village following revocation of a permit for construction of a new garage had a protected property interest in the permit.  This Court likewise concludes that the plaintiff has a protectable property interest in the conditional land use permit.

The Court finds no protectable liberty interest, however.  A constitutionally recognized liberty interest "may be implicated by certain injuries to a person's reputation or good name which threaten to restrain the individual's freedom to pursue business or employment opportunities." *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 413 (6th Cir. 2002) (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).  Where the state actor neither precluded the plaintiff business from entering into other  contracts nor defamed the plaintiff company's good name, no deprivation of a protected liberty interest occurs.  *Alliance for Children, Inc. v. City of Detroit Pub. Schs.*, 475 F. Supp. 2d 655 (E.D. Mich. 2007) (holding that a provider of supplemental educational services who was removed from the approved list of providers of tutorial services to underachieving students failed to state a due process claim based on his liberty interest in the continued operation of his business).  The plaintiff did not allege that the city publicly defamed it, nor have the defendants interfered with the plaintiff's right to enter into other contracts.

The second element of the plaintiff's procedural due process claim requires proof of a deprivation.  None has occurred here, as least with respect to the plaintiff's protected interest in the land use permit.  The city has not revoked the permit, nor has it interfered with the operation of the facility.  Rather, the city seeks to hold a hearing to revoke the permit.  That is not a deprivation of due process; it is fulfillment of due process.  "The essence of due process is that a deprivation of a property or liberty interest must 'be preceded by notice and opportunity for hearing appropriate to

the nature of the case.'" *Brickner v. Voinovich*, 977 F.2d 235, 237 (6th Cir. 1992) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Here, the plaintiff is receiving notice and a hearing of the intended deprivation. Procedural due process claim requires nothing more.

2.

The plaintiff also argues that the defendants have violated its rights under the Equal Protection Clause by discriminating against the female owner of the business and by treating the plaintiff as a class of one differently than other similarly situated businesses. The first part of the argument can be dismissed out of hand: there is no evidence that the plaintiff's owner's gender played any role in the defendants' decisions.

"The Supreme Court has recognized successful equal protection claims brought by a 'class of one' where the plaintiff alleges that he or she has been treated differently from similarly situated individuals." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000)). The Supreme Court has "explained that the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Willowbrook*, 528 U.S. at 564 (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923) (internal quotation marks and alterations omitted)).

To establish a claim of class-of-one selective enforcement, a plaintiff must show "either that [the government actor] distinguished between [the plaintiff and others] based on some bad reason, proving intent, *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34

-17-

(6th Cir.2002), or that [the government actor] had no rational reason to distinguish between [the plaintiff and others]." *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004). The proof requires establishing that the plaintiff was selectively treated compared to others similarly situated and that the selective treatment was motivated by an intention to discriminate such as "race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *R.S.S.W., Inc. v. City of Keego Harbor*, 18 F. Supp. 2d 738, 746 (E.D. Mich. 1998), *rev'd on other grounds*, 397 F.3d 427 (6th Cir. 2005) (citing *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)).

The plaintiff argues that it has been held to more exacting requirements than other environmental operators. It points to the statement of Amru Meah, the city's Director of the Building and Safety Engineering Department who testified that no special land use permit ever has been revoked because of the expiration of a host agreement. Meah also stated that in his twenty-four years in the department, he cannot recall any revocation of special land use permits without the city first issuing a citation and giving the entity an opportunity to correct the deficiency. Steven Leggat, the chief of the property maintenance in the Buildings and Safety Engineering Department testified that he has "sent correction orders like this that we have advised property owners of their noncompliance and have encouraged compliance. Generally speaking we get compliance for special land use grants because of the reality of noncompliance, that they want to maintain their business and they understand that." Notice of Filing of Suppl. Docs. in Supp. to Pl.'s Mot., Ex. 4 [dkt. # 21-4] (Leggat dep.) at 26-27.

Unlike others who have been given a chance to cure deficiencies, the plaintiff contends that it has been deprived of that opportunity, since defendant Williams allegedly stated that there is

nothing the plaintiff can do in order to continue its operations. Williams stated that to continue operations, the plaintiff would have to enter into another host community agreement with the City, and she announced the decision not to renew the host community agreement with the plaintiff at a public meeting in southwest Detroit in February 2009, even before she communicated that decision to the plaintiff.

Williams testified that the city has host community agreements with only two other businesses, both of which are transfer stations handling hazardous waste: Americal Corporation and Dynecol. David Whitaker, the city's Director of Research and Analysis Division, wrote that recycling/composting facilities are not regulated by the state. Instead, Wayne County issues a solid waste plan registration to such facilities, and the facilities must obtain an approved license from the City of Detroit, in turn requiring the execution of a Host Community Agreement, to receive the Wayne County's license. Notice of Filing of Suppl. Documents in Supp. of Pl.'s Mot. for Prelim. Inj., Ex. 1.G [dkt. # 20-8] (Whitaker letter, Nov. 19, 2007). Americal and Dynecol previously have been cited for violations of their respective community host agreements, and their agreements are not in jeopardy. Williams acknowledged at her deposition that Systematic was the first entity ever to be required to enter into a community host agreement. The plaintiff points out that even after it entered into the host community agreement, the city has not required other entities to enter into such agreements. For example, Williams said that Marathon Oil has obtained a special land use permit even though it was not required to enter into a similar agreement. Williams also testified that although Williams received hundreds of complaints from the Southwest Detroit Environmental Vision about nearly every business in Southwest Detroit, Williams has not chosen to commence closure activities for any entity but the plaintiff.

This evidence, however, will not satisfy the plaintiff's heavy burden of showing irrational discrimination by the city. "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006) (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)). To make its case, the plaintiff is obliged to "either . . . negativ[e] every conceivable basis which might support the government action, or . . . demonstrat[e] that the challenged government action was motivated by animus or ill-will." *Warren*, 411 F.3d at 711 (internal quotation marks and citations omitted).

Although the city arguably may have demanded less of other businesses whose activity impacted the environment, the City has offered ample justification for its refusal to renew the host community agreement and its stated intention to commence permit revocation proceedings. There is substantial evidence that the host community agreement was procured by bribing public officials. Even if the plaintiff itself was not involved in the bribe, the prospect of corruption undermines the validity of the decision to allow the environmentally sensitive land use in the community. Although the city itself has not issued citations against the plaintiff, both the Wayne County Department of Environment and the MDEQ have found violations of laws, regulations and requirements on several occasions. In addition, on at least three occasions the fire department has been called to extinguish fires that have spontaneously ignited in the compost piles. Finally, residents and community groups have complained about the odors emitted by the plaintiff's facility. The plaintiff has not "negatived" these bases, nor is it likely that it will.

* * * * * * *

The Court concludes that the plaintiff has not demonstrated a substantial likelihood of success on the merits of its claim.

B.

The other factors do not favor a preliminary injunction. Certainly, closing the plaintiff's facility and requiring its clean up will inflict great injury on the plaintiff. However, dissolving the state court's TRO does not translate directly into closure. Rather, immediate result will be a hearing, preceded by notice, at which the plaintiff will have an opportunity to be heard, followed by judicial review in the state courts.

Next, the possibility of harm to others if the facility continues operating is significant because, even though irreparable contamination of the site and the surrounding area is not very likely, the possibility of harm remains if operations are allowed to continue as before. The evidence suggests that the company has created fire hazards, stored too many compost piles within a small area, compromised air quality beyond the acceptable norms, provoked numerous complaints from the area's residents, and allowed accumulations of pests and standing water.

Finally, although the plaintiff disputes these allegations, the public interest is served by allowing the revocation proceedings to go forward so these grievances can be aired.

III.

The Court concludes, therefore, that the relevant factors disfavor a preliminary injunction.

Accordingly, it is **ORDERED** that the defendants' motion for clarification of and relief from the state court's temporary restraining order [dkt #5] is **GRANTED**.

It is further **ORDERED** that the plaintiff's amended motion for a preliminary injunction [dkt #13] is **DENIED**.

It is further **ORDERED** that the temporary restraining order is **DISSOLVED**.

It is further **ORDERED** that counsel for the parties shall appear for a status conference to discuss case management deadlines **on March 3, 2010 at 3:30 p.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   February 17, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 17, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO